IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

ROMÁN SEBASTIÁN MONZÓN,            )
                                   )
            Plaintiff,             )       Civil Action No. 7:22-cv-00161
                                   )
v.                                 )       **MEMORANDUM OPINION**
                                   )
JENNIFER D. SPANGLER, *et al.*,    )       By:    Hon. Thomas T. Cullen
                                   )              United States District Judge
            Defendants.            )

Román Sebastián Monzón ("Monzón"), a Virginia inmate proceeding *pro se*, filed this civil action under 42 U.S.C. § 1983 against three members of the River North Correctional Center ("River North") mental-health staff. Specifically, Monzón alleges that three psychology associates, Ms. Jennifer Spangler and Drs. Dayna Haynes and Robert Sturdivant (collectively, "Defendants") violated his[1] constitutional rights to adequate and equal mental healthcare. Monzón asserts that, after he filed grievances complaining about that perceived lack of care, Dr. Haynes retaliated by filing disciplinary charges against him. The matter is before the court on Defendants' motion for summary judgment, which argues that there are no genuine issues of material fact, and that the undisputed evidence conclusively establishes there was no constitutional violation. (ECF No. 43.) The court agrees and will grant Defendants' motion for summary judgment.

## I.    BACKGROUND

The record is based on Monzón's verified Amended Complaint, his and two other

---

[1] Monzón indicates that he is transgender, but uses masculine pronouns in his Amended Complaint, so the court does the same. (*See generally* Am. Compl. [ECF No. 37].)

inmates' signed declarations, declarations from each Defendant and a River North Hearing Officer, and records regarding Monzón's medical health and grievance history.

## A.    Facts Relating to Mental-Health Claims

The pertinent events giving rise to Monzón's lawsuit began on November 10, 2020, when Monzón, who had recently come out as transgender, asked to speak with a member of River North's mental-health staff. (Monzón Decl. ¶ 4 [ECF No. 37-1]; ECF No. 37-2 at 17.) Dr. Sturdivant met with Monzón on November 17. (Monzón Decl. ¶ 5; ECF No. 37-2 at 1.)

During that initial assessment, Monzón allegedly told Dr. Sturdivant that he "had recently come out as a transgender, had a previous diagnosis of bipolar, and had previously been hospitalized for mental-health reasons, including for suicide attempts." (Monzón Decl. ¶ 5.) Monzón further "noted [he] was experiencing symptoms of gender dysphoria . . . and bipolar disorder, that [he] had been engaging in acts of self-harm, and that [he] would like to discuss those problems with [Dr. Sturdivant]." (*Id.*) There is no evidence that Monzón described what these symptoms were in any significant detail—or how he was suffering from them—to Dr. Sturdivant at the time. Indeed, aside from his statements that he was experiencing general symptoms, which the court accepts as true, Monzón fails to point to anything in the record to show he conveyed those specific symptoms, and how they caused him to suffer, to Defendants.

Dr. Sturdivant's report and recollection of that first meeting are somewhat different from Monzón's account. According to his report from that day, he did not observe—and claims Monzón did not report—any suicidal behavior or threat of self-harm, any psychotic symptoms or delusional ideation, or any other symptoms indicative of gender dysphoria or

bipolar disorder. (*See* ECF No. 37-2 at 1.) Dr. Sturdivant recommended continued monitoring "per [prison] policy and as needed." (*Id.*) In a declaration, he later recalled that, based on his observations and Monzón's "description of his mental health[, he] found no clinically significant symptoms of thought or mood disorder or other signs of a mental disorder." (Sturdivant Decl. ¶ 6 [ECF No. 44-1].) Moreover, Dr. Sturdivant asserts that Monzón "denied any mental-health problems and denied suicidal . . . ideation or self-directed violence. There was no indication that [Monzón] suffered from Bipolar Disorder or Gender Dysphoria." (*Id.*)

After that initial assessment, Monzón submitted another request form in which he noted "I recently came out as transgender, I would like to address some concerns on this matter with you privately." (ECF No. 37-2 at 18.)

On November 24, during the mental-health department's weekly rounds of inmates in the Restorative Housing Unit ("RHU"), Monzón says he spoke to Spangler about substantially the same issues he discussed with Dr. Sturdivant the week prior. (Monzón Decl. ¶ 9.) Monzón told Spangler that he had previously "received inpatient mental[-]health evaluation and treatment" as recently as March 2012.[2] (*Id.*) He also "requested an evaluation relating to symptoms of" gender dysphoria, which Monzón alleges Spangler interpreted as a request for a "transgender assessment." (*Id.*) Spangler's report noted that Monzón asked to see Dr. Sturdivant to conduct a "transgender assessment." (ECF No. 37-2 at 2.) According to Spangler's report, Monzón did not report any other symptoms, nor did Spangler observe any

---

[2] Monzón does not specify the nature of this evaluation and treatment. He notes in his amended complaint, however, that he "was diagnosed with bipolar as a child and received treatment for that condition until age 18 when he moved out of his parents' house." (Am. Compl. ¶ 92.) Monzón cites to his "inpatient mental[-]health evaluation and treatment" in the following paragraphs, so the court infers that he received treatment for bipolar disorder in 2012. (*Id.* ¶¶ 92–95.)

other symptoms indicative of any mental health issue. (ECF No. 37-2 at 2.)

Defendants state that "there is no such thing as a 'transgender assessment.'" (*E.g.*, Spangler Decl. ¶ 9.) Like Dr. Sturdivant, Spangler also asserts that she saw "no clinically significant symptoms of thought or mood disorder or other signs of a mental disorder," and noted Monzón should continue to be monitored. (*Id.*)

Monzón met with Dr. Sturdivant during RHU rounds on December 1, December 8, January 5, and January 12, and echoed the same concerns as recounted above, but never received the full evaluation and treatment he desired. According to Monzón, Dr. Sturdivant only instructed him to be patient. (Monzón Decl. ¶¶ 11–16.) As of December 9, Monzón was no longer flagged as a high-risk sexual victim in the prison's computer system. (Sturdivant Decl. ¶ 13 [ECF No. 44-1].) The same day, after having seen Monzón three times in the past month, Dr. Sturdivant "determined that [Monzón's] mental[-]health classification should be [lowered,] indicating [his] mental health was stable and there was no current need for mental[-]health treatment." (*Id.*)

On December 3, 2020, Monzón "submitted a request form to [Dr.] Sturdivant focusing on the most pressing causes of [his] mental distress [but] did not have sufficient space to cover all of [his] problems." (Monzon Decl. ¶ 13.) In that Offender Request form, Monzón stated his fear of sexual and other violence from fellow inmates after he "recently came out as transgender" and requested "entry in the SAM pod."[3] (ECF No. 37-2 at 20.) The request does

---

[3] "The SAM pod is a special housing unit for vulnerable inmates who require closer monitoring and support than the general prison population. . . . There are three primary types of inmates who can be considered for SAM pod placement: (1) medically vulnerable inmates, (2) inmates made vulnerable because of their mental health status with a mental health classification of at least MH-2, and (3) other vulnerable inmates such as those with a small stature or geriatric inmates." (Haynes Decl. ¶ 18 [ECF No. 44-3].)

not mention gender dysphoria, bipolar disorder, or self-harm, let alone describe any symptoms that would indicate that he was actually suffering from the same. (*Id.*) Spangler responded that the mental-health department would review his request for entry into the SAM pod but warned it "may be a lengthy process." (*Id.*) Months later, Dr. Haynes determined he did not "meet the minimum criteria . . . for SAM pod placement." (ECF No. 44-1 at 20.) Monzón's request was denied without further evaluation. (*See* Haynes Decl. ¶ 18.)

On September 21, 2021, Monzón sent an external e-mail (that was promptly flagged by River North staff) in which he wrote that he "was begging God to strike me down because all I could think of was how badly I wanted to kill myself." (ECF No. 44-1 at 23.) The next day, Dr. Sturdivant spoke to Monzón face-to-face to assess the risk of Monzón's suicidality. (ECF No. 44-1 at 24.) Monzón told Dr. Sturdivant that he had no recollection of sending the e-mail but did not deny sending it. (*See* Monzón Decl. ¶ 26.) In a contemporaneous record created by Dr. Sturdivant of their conversation, Monzón is quoted as saying, "I feel great, or as well as I can in prison. (The email message) might be hyperbole." (ECF No. 44-1 at 24.) The document goes on to state that Monzón "insisted he was not suicidal." (*Id.*) Despite denying suicidality, Monzón alleges he told Dr. Sturdivant that he "had other mental[-]health concerns" he wanted to address, but Dr. Sturdivant focused only on the e-mail and present feelings of suicidal ideations. (Monzón Decl. ¶¶ 26–27.)

Six days later, Monzón claims he filed another request form, "seeking treatment for mood problems stemming from his bipolar condition and gender dysphoria concerns" but

never received a response.[4] (Monzón Decl. ¶ 29.) Four days later, on October 1, 2021, he submitted a written complaint outlining the same concerns about his lack of mental healthcare. (ECF No. 37-2 at 10.) Dr. Haynes responded that Monzón had been seen by mental-health staff recently—in regard to the e-mail—and "did not express any mental[-]health concerns" at that time. (*Id.*) Additionally, Dr. Haynes said that "all of [Monzón's] request forms have been dealt with in the appropriate fashion." (*Id.*)

Monzón asserts that he spoke to a guard on November 15, 2021, and asked to speak to mental-health staff. After he denied having any "violent impulses [or] suicidal or homicidal ideation," another guard instructed Monzón to fill out a request form. (Monzón Decl. ¶¶ 33–34.) Monzón stated that he had already done so, but had "been waiting over a year for evaluation and treatment." (*Id.* ¶ 34.) Then, on November 22, 2021, Spangler came to Monzón's housing unit and spoke to other prisoners about mental-health issues but allegedly did not speak to Monzón. (*Id.* ¶ 35.)

Throughout the record, Monzón never specifies exactly what evaluation or treatment he desired or thinks he was entitled to. He requested to be seen by the mental-health staff several times, and it is undisputed that he met and expressed his concerns about his mental health on numerous occasions.[5]

---

[4] Unlike every other request Monzón referenced in his Amended Complaint and declaration, he did not supply a record of this request. Nevertheless, the court takes Monzón's assertion as true.

[5] Monzón asserts that on August 19, 2022—after the initiation of this lawsuit—he "was finally given the opportunity" to speak to Dr. Sturdivant about his concerns. (Monzón Decl. ¶¶ 39–40.) Monzón does not state how this 5-minute meeting—which appears to satisfy what he was looking for all along—differs from the previous meetings he had with Dr. Sturdivant or Spangler.

**B.      Facts Relating to Retaliation Claims**

After he was denied placement in the SAM pod, Monzón wrote an informal complaint to Dr. Haynes, in which he used her first name. Dr. Haynes wrote, in response, "My name is Doctor Haynes," and explained that Monzón's request was denied because he did "not meet the minimum criteria and therefore will not be evaluated specifically by me for SAM pod placement face-to-face." (ECF No. 44-1 at 20.)

Approximately one week after receiving that response, on April 13, 2021, Monzón included the following in an Offender Request that he addressed to "Ms. Haynes":

> [I]f you please, your name is Dayna Haynes; "Doctor" is not a
> name, it is a title, and a little deserved one in your case. If you
> don't like people calling you by your name[,] then you should stop
> working for the state as your name is a matter of public record
> for that reason. However, your lack of competency is evident by
> the fact that you work for the state; I will soon be filing a federal
> lawsuit against you, but I know it won't be the first for you. I
> certainly hope to expose your misconduct forthwith. Have a nice
> day.

(ECF No. 44-1 at 21.) Two weeks later, Dr. Haynes responded, notifying Monzón that he was "written a charge for the contents of this request form." (*Id.*) Dr. Haynes filed a charge against Monzón for violating Offense Code 222—the use of insolent language directed toward a prison employee—because he used her first name after she told him to refer to her as Dr. Haynes and included other disrespectful language in his response. (*See* ECF No. 37-2 at 21; Haynes Decl. ¶ 19.)

After a hearing, Monzón was found guilty of the charge, and received 30 days of commissary restriction as his penalty. (ECF No. 37-2 at 23.) That finding was approved on institutional review (*id.*), affirmed by the Warden (who noted there were "plenty of . . . facts

to justify a finding of guilt," and that "it has been a long-time practice in the DOC for inmates not to address staff members by their first name" (ECF No. 37-2 at 31)) and upheld by the Regional Administrator (ECF No. 37-2 at 30). In his written decision affirming the finding, the Warden also directed Monzón "to address Dr. Haynes as 'Dr. Haynes' in the future. Furthermore, you are not to address other staff by their first name." (ECF No. 37-2 at 31.)

Monzón, however, did not heed that directive and, on October 13, 2021, filed a Regular Grievance in which he identified Defendants by their first and last names and complained about the perceived deficient mental-health services. (ECF No. 37-2 at 12.) He also asserted that his recent meeting with Dr. Sturdivant to assess if he had suicidal ideations based on his e-mail was merely an attempt by "Dayna Haynes [to] . . . try[] to cover up the incompetence and malice of herself and her coworkers." (*Id.*)

On receipt of the grievance, Dr. Haynes filed a Disciplinary Offense Report charging Monzón with another Offense Code 222 violation. (ECF No. 37-2 at 25.) Specifically, Dr. Haynes noted that Monzón used Defendants' first names "despite being charged in the past for this same conduct," and used additional insolent language. (*Id.*) At a subsequent hearing, the charge was dismissed because of Dr. Haynes's failure to follow VDOC procedure in writing the charge. (ECF No. 37-2 at 26.) Monzón asserts that, when the audio-recording device was turned off after that hearing, the hearing officer told him and another inmate that "[s]ome people came and talked to me about that charge, they really wanted me to find you guilty of it, but I thought it was stupid." (Monzón Decl. ¶¶ 37.) When asked who had spoken to the hearing officer, she allegedly said, "I'm sure you already know." (*Id.*) The same hearing officer avers that "the conduct . . . described in the Disciplinary Offense Report, if properly

filed and proven true, would have been enough to find Plaintiff guilty of using vulgar or insolent language against an employee pursuant to Offense Code 222." (Stanley Decl. ¶ 7 [ECF No. 44-4].)

**C.    Procedural History**

Monzón originally filed his Section 1983 suit on March 21, 2022. (ECF No. 1.) Exactly one year later, he amended his complaint, bringing an Eighth Amendment deliberate indifference claim against each Defendant, a Fourteenth Amendment equal protection claim against each Defendant, and a First Amendment retaliation claim against Dr. Haynes. Monzón has sued each Defendant in their individual capacity and seeks a total of $6,910 in compensatory damages and $16,790 in punitive damages. (Am. Compl. at 11–12.) Defendants have moved for summary judgment. (ECF No. 43.)

## II.    STANDARD OF REVIEW

Under Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court considers "the pleadings, depositions, answers to interrogatories, and admissions on file, together with [any] affidavits" filed by the parties. *Celotex*, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citation omitted). The moving party bears

the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets that burden, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn*, 710 F.3d at 213 (citing *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. The nonmoving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" *Glynn*, 710 F.3d at 213 (quoting *Anderson*, 477 U.S. at 252). It must show that "there is sufficient evidence . . . for a jury to return a verdict" in its favor. *Anderson*, 477 U.S. at 249. "In other words, to grant summary judgment the court must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990) (citing *Anderson*, 477 U.S. at 248). Even when facts are not in dispute, the court cannot grant summary judgment unless there is "no genuine issue as to the inferences to be drawn from" those facts. *World-Wide Rights Ltd. P'ship v. Combe, Inc.*, 955 F.2d 242, 244 (4th Cir. 1992).

Finally, because Monzón is proceeding *pro se*, the court must construe his complaint liberally. *See Boag v. MacDougall*, 454 U.S. 364, 365 (1982).

### III.   ANALYSIS

When viewing the facts in the light most favorable to Monzón, he has failed to demonstrate the requisite constitutional harm for a Section 1983 claim.[6] Accordingly, the court will grant Defendants' motion for summary judgment.

**A.    Eighth Amendment—Deliberate Indifference**

Monzón alleges that Defendants' deliberate indifference in failing to provide him with satisfactory mental-health treatment violated his Eighth Amendment right to be free from cruel and unusual punishment.

The Eighth Amendment secures a prisoner's right to receive adequate mental healthcare while he is incarcerated. *See DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018). But it does not give a prisoner the right to receive any medical treatment he *thinks* is necessary or desirable. *See Delk v. Moran*, No. 7:16-cv-00554, 2019 WL 1117922, at *5 (W.D. Va. Mar. 11, 2019). The right to treatment is limited, and the contours of that right are shaped by "medical necessity and not simply that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977). Nevertheless, a "prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).

An Eighth Amendment claim based on inadequate medical care involves both an

---

[6] Defendants raise qualified immunity as an alternative basis for summary judgment. Because the court resolves this matter on the merits of Monzón's claims, it does not reach the issue of qualified immunity.

objective and subjective element. *Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021). The objective element requires "an inmate . . . [to] establish that his medical condition was objectively serious—that is, 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Id.* (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)). The "subjective element requires that the prison official . . . 'had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction.'" *Short v. Hartman*, 87 F.4th 593, 612 (4th Cir. 2023) (quoting *Jackson*, 775 F.3d at 178). The official's state of mind must be more than negligent but does not require actual intent; "deliberate indifference is most akin to criminal-law recklessness." *Pfaller v. Amonette*, 55 F.4th 436, 445 (4th Cir. 2022).

In the instant matter, Monzón alleges he was suffering from three medical conditions to which Defendants were deliberately indifferent: (1) bipolar disorder; (2) gender dysphoria; and (3) self-harm/suicidality. (*See* Am. Compl. ¶¶ 85–86.) The court assumes, without deciding, that Monzón establishes at least a genuine dispute of fact on the objective prong for those conditions and that Defendants subjectively knew he had a history of bipolar disorder and self-harm.[7] But Monzón's Eighth Amendment claim cannot survive based on any of the

---

[7] Where mental-health staff conclude that an inmate does not have any of the purported medical conditions—much less that such a condition is sufficiently serious—and the inmate has failed to present other competent medical evidence affirming his self-diagnosis, the court has trouble seeing that an inmate actually has the purported condition, much less that it is sufficiently serious. The court has significant doubts that, even under a liberal construction of his pleadings and evidence, Monzón puts forth enough evidence to satisfy this prong. Nevertheless, the court accepts as true, for purposes of this motion, his statement in his verified amended complaint that he was diagnosed with bipolar disorder in his childhood and that he told Defendants he had been engaging in self-harm. (*See* Am. Compl. ¶¶ 9, 92.) But he has not put forth any evidence that he was suffering from gender dysphoria apart from his own self-diagnosis.

three medical conditions because he does not set forth any evidence to create a genuine issue of fact that any of the Defendants "knew of and disregarded an excessive risk to [Monzón's] health or safety." *Phoenix v. Amonette*, No. 22-6313, 2024 WL 1145978, at *5 (4th Cir. Mar. 18, 2024) (cleaned up).

As the Fourth Circuit recently noted, "[t]hat standard is high." *Id.* A prison official who knows of a prisoner's serious medical condition is not deliberately indifferent if she responds "reasonably to the risk." *Farmer v. Brennan*, 511 U.S. 825, 844 (1994); *see Pfaller*, 55 F.4th at 445. It is well-settled that "'[d]isagreements between an inmate and a physician over the inmate's proper medical care' are not actionable absent exceptional circumstances." *Hixson*, 1 F.4th at 302–03 (quoting *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985)). Mere negligence or medical malpractice does not give rise to deliberate indifference. *See Delk*, 219 WL 1117922, at *6. "[Q]uestions of medical judgment are not subject to judicial review." *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975). And "[a]n inmate's complaints about the quality of the medical treatment do not amount to deliberate indifference to serious medical needs, which is the constitutional test." *Delk*, 2019 WL 1117922, at *5 (cleaned up). Rather, a prison official is liable for deliberate indifference only if "the treatment given [was] so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Hixson*, 1 F.4th at 303. (internal quotation omitted).

After Monzón sent his initial request form asking to be seen by a member of River North's mental-health staff on November 10, 2020, he spoke, albeit briefly, with a member of River North's mental-health staff—Dr. Sturdivant or Spangler—approximately once a week for more than a month. (*See* Monzón Decl. ¶¶ 4–18.) After each meeting, the mental-health

staff filed a report that indicated the plan for Monzón's treatment was to "[c]ontinue to monitor per policy and as needed." (*See* ECF No. 44-1 at 12–14, 17, 18.) Monzón may believe that these meetings were perfunctory, but he does not dispute that they occurred. And importantly, Monzón does not articulate what additional care or treatment was constitutionally mandated. In all those meetings, Dr. Sturdivant and Spangler reasoned in their professional judgment that Monzón—even if he had a history of bipolar disorder or self-harm—was not presently suffering from suicidal ideations or symptoms for gender dysphoria or bipolar disorder. (*See, e.g.*, Sturdivant Decl. ¶¶ 22–25; Spangler Decl. ¶¶ 22–24, 26.)

Even after the weekly RHU check-ins at Monzón's cell stopped, River North continued to monitor Monzón for suicidal ideations. Dr. Sturdivant promptly met with and assessed Monzón after his e-mail indicating suicidal thoughts was flagged. (Am. Compl. ¶¶ 28–31; Sturdivant Decl. ¶ 19.) For his part, Monzón allegedly did not remember sending the message. (Am Compl. ¶ 30.) But in Dr. Sturdivant's records, he notes that Monzón "insisted he was not suicidal" and quotes Monzón as saying he "feel[s] great, or as well as I can in prison. (The email message) might be hyperbole." (ECF No. 44-1 at 24.)  Dr. Sturdivant noted that he should continue to be monitored. (*Id.*) According to Monzón, he also requested to speak with mental-health staff on November 15, 2021, but was told to file a request form *after* he admittedly denied having suicidal ideations. (Monzón Decl. ¶¶ 33–34.)

Viewing the facts in the light most favorable to him, Monzón has presented evidence that Defendants knew he had been diagnosed with bipolar disorder as a child and was last

treated for it in 2012, and he had at some point engaged in self-harm.[8] But Monzón has not presented any evidence that he was currently suffering from the disorders he claims, or how they manifested themselves such that treatment of any type was medically necessary. In other words, Monzón argues that, because he had a *diagnosis* of bipolar disorder from childhood, he was entitled to choose how he was to be evaluated and his course of treatment. The Constitution is not that demanding. *See Bowring*, 441 F.2d at 47–48. Rather, he is entitled to reasonable treatment if he is suffering from symptoms that make such treatment a "medical necessity." *Id.* at 48. Similarly, as it relates to Monzón's self-report of suicidal ideation, he has not pointed to any evidence that would compel the conclusion that continued monitoring by experienced mental-health professionals was an insufficient response, particularly when he denied having suicidal ideations on multiple occasions. A prison official who "simply took less action than he could have" but otherwise acted reasonably in monitoring an inmate is not deliberately indifferent. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2001); *Delk*, 2019 WL 1117922, at *6 ("At most, [the defendant] was negligent by not inquiring into [the prisoner's] request. Regardless . . . disagreement with the course of treatment cannot sustain a constitutional claim.").

At bottom, Monzón's deliberate indifference claims amount to disagreements on diagnosis and treatment. He thought that he merited more treatment; mental-health

---

[8] As opposed to providing valid evidence that he had previously been diagnosed with bipolar disorder and engaged in self-harm, the only evidence Monzón presents to support his belief that he had gender dysphoria is just that—his belief. Where a prisoner's only evidence is his belief that he has a disease, but the prison psychologist puts forth a sworn declaration stating that he does not, he "has not created a genuine issue of material fact that would keep his case alive." *Maggert v. Hanks*, 131 F.3d 670, 671 (7th Cir. 1997) (affirming dismissal of an Eighth Amendment deliberate indifference claim where a transgender prisoner thought he had gender dysphoria but the prison psychologist did not).

professionals disagreed and found continued monitoring to be sufficient. Without more, that does not violate the Eighth Amendment. *See Payne v. Davis*, No. 7:22-cv-00710, 2023 WL 4687934, at *2 n.3 (W.D. Va. July 21, 2023). Even taking Monzón's version of the facts as true, no reasonable jury could find that Defendants were deliberately indifferent to Monzón's mental health conditions because they did not believe whatever condition existed posed a serious medical risk to Monzón.[9] *Contra Phoenix*, 2024 WL 1145978, at *6 (reversing a grant of summary judgment because "a reasonable jury could conclude that [the prison doctor's] failure to provide the level of care he himself believed is necessary for celiac disease amounted to a failure to respond reasonably to a serious medical need of which he was subjectively aware") (cleaned up).  Defendants are entitled to summary judgment on Monzón's Eighth Amendment claims.

## B.    Fourteenth Amendment—Equal Protection

Monzón next brings a "class of one" equal protection claim,[10] asserting that Defendants violated his Fourteenth Amendment right to equal protection when they failed to provide him the same level of mental healthcare as inmates who had been diagnosed with bipolar disorder or gender dysphoria.

The Fourteenth Amendment provides that "[n]o State shall . . . deny to any person

---

[9]  The court recognizes that mental health may be fluid and can rear its ugly head after years of dormancy. But that does not excuse the fact that Monzón has not provided any evidence to support that the Defendants knew he was suffering from his conditions in such a way that required more attention than they already gave him.

[10]  Neither party explicitly classifies it as such, but Monzón's equal-protection claim is of the "class of one" variety because he "claims [he] has been irrationally singled out" by Defendants rather than "alleg[ing] class-based discrimination." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601 (2008). Monzón claims he was given different treatment than those with allegedly similar mental-health conditions, not that he was discriminated against because he is transgender. *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). For example, at least one of those similarly-situated inmates that Monzón asserts was given different treatment—Tyrone Johnson—is also transgender. (*See* Am. Compl. ¶ 75; Johnson Aff. ¶ 4 [ECF No. 37-4].)

within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The "clause 'is essentially a direction that all persons similarly situated should be treated alike.'" *Sansotta v. Town of Nags Head*, 724 F.3d 533, 542 (4th Cir. 2013) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). A prisoner's class-of-one equal protection claim is successful if he establishes that: (1) he was "intentionally treated differently from others similarly situated" and (2) "there is no rational basis for the difference in treatment." *Vill. of Willowbrook*, 528 U.S. at 564; *King v. Rubenstein*, 825 F.3d 206, 220 (4th Cir. 2016).

### 1.   Gender Dysphoria Comparators

Defendants argue that Monzón's equal protection claim fails at the first element because the comparators Monzón identifies are not similarly situated. The court agrees with respect to the gender dysphoria comparators, but not the bipolar disorder comparators.

Failure to establish "a similarly situated comparator is fatal to a class-of-one claim." *Wilson v. Town of Mount Jackson*, No. 5:21-cv-00055, 2022 WL 819531, at *13 (W.D. Va. Mar. 17, 2022) (citing *Siena Corp. v. Mayor & City Council of Rockville*, 873 F.3d 456, 465 (4th Cir. 2017) and *Tri-Cnty. Paving, Inc. v. Ashe Cnty.*, 281 F.3d 430, 440 (4th Cir. 2002)). For purposes of a Fourteenth Amendment equal protection claim, "'similarly situated' means that the other [individuals] 'are in all relevant respects alike' to the plaintiff." *Love v. City of Charleston*, 597 F. Supp. 3d 855, 860 (D.S.C. 2022) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)).

Monzón's gender-dysphoria comparators are not similarly situated because, by Monzón's own admission, they have actually been diagnosed with a condition with which Monzón has never been diagnosed. (Am. Compl. ¶ 75–76.) He names three fellow inmates who have been "diagnosed with gender dysphoria" who, he claims, received the treatment he

seeks. (*Id.* ¶¶ 74–76.) One of those inmates, Tyrone Johnson, swears in an affidavit that "[a]fter coming out as transgender, [he] was promptly provided mental[-]health evaluation and treatment . . . by [D]efendants." (Johnson Aff. ¶ 4.)

At first blush, Johnson seems like the perfect comparator; he, too, is a transgender inmate with mental-health problems. But according to Monzón, Johnson has been diagnosed with gender dysphoria. Monzón has not. Johnson and the other inmates listed by Monzón are not "in all relevant respects alike," and are therefore not similarly situated because medical professionals have diagnosed them with gender dysphoria, a condition Monzón merely claims to have. *See Lowe*, 597 F. Supp. 3d at 860. This dooms Monzón's claim that he did not receive the same equal protection of law as other inmates who have been diagnosed with gender dysphoria.

### 2.    Bipolar Disorder Comparators

Monzón satisfies the first element of his class-of-one equal-protection claim on this front because he identifies four other inmates who have been diagnosed with bipolar disorder. (Am. Compl. ¶ 76.) Again, the court must accept as true at this stage Monzón's testimony that, at some point in his childhood, he too was diagnosed with bipolar disorder. (*See id.* ¶ 92.)

The second element of Monzón's claim is established if "there is no rational basis for the difference in treatment" between Defendants' choice not to provide the same treatment as other inmates suffering from bipolar disorder. *Vill. of Willowbrook*, 528 U.S. at 564. Rational basis is a deferential standard, especially when reviewing a doctor's decision in the prison context. *See Fauconier v. Clarke*, 966 F.3d 265, 277 (4th Cir. 2020) ("To account for the unique health and welfare concerns in the prison context, [the court's] review of a plaintiff's challenge

to a prison decision . . . is more demanding, as [the court] accord[s] deference to the appropriate prison authorities.") (cleaned up); *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975) ("[Q]uestions of medical judgment are not subject to judicial review.").

There is, of course, a rational reason as to why Defendants treated Monzón differently than the other inmates who are presently suffering from bipolar disorder, even assuming they knew he had been diagnosed with bipolar disorder in his childhood: in Defendants' professional judgment, he did not present symptoms of bipolar disorder, was not suffering from the condition, and would not benefit from treatment. (*See* Sturdivant Decl. ¶ 24; Spangler Decl. ¶ 24; Haynes Decl. ¶ 28.) The court is wary of second guessing the judgment of multiple mental-health professionals, particularly in the prison context. *See Bowring*, 551 F.2d at 48 ("[D]isavow[ing] any attempt to second-guess the propriety or adequacy of a particular course of treatment."). Moreover, Monzón presents no evidence to raise a genuine dispute of material fact as to Defendants having anything but a logical reason for treating his dormant bipolar disorder in a different manner than others. According to the evidence in the record, he was not presenting specific symptoms that suggested he was currently suffering from bipolar disorder. He asserts that Defendants never evaluated him but he does not reconcile the fact that Defendants *did* evaluate him during their encounters with Monzón. (*See, e.g.*, Sturdivant Decl. ¶ 24 ("During one encounter, I asked [Monzón] to describe which symptoms of Bipolar Disorder he thought he was experiencing; [Monzón] was unable to describe any bipolar symptoms he was experiencing.").) Accordingly, Defendants are entitled to summary judgment on Monzón's Fourteenth Amendment claims.

### C.     First Amendment—Retaliation

Monzón's final claim alleges that Dr. Haynes retaliated against him for filing grievances because she charged him with two bogus disciplinary infractions after he submitted an Offender Request on April 13, 2021, and a Grievance on October 13, 2021, in violation of his First Amendment rights. Dr. Haynes counters that she filed the legitimate charges to reprimand Monzón's use of insolent language that just so happened to be *within* his filings.

Prisoner "[c]laims of retaliation must . . . be regarded with skepticism," because "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct." *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994). In the same vein, the court largely defers to prison officials on disciplinary matters, cognizant of the fact that it is "inexpert in and ill[-]equipped to deal with matters of prison administration." *Durkin v. Taylor*, 444 F. Supp. 879, 882 (E.D. Va. 1977).

Nevertheless, a prisoner has a triable First Amendment retaliation claim if he establishes that "(1) he engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendant's conduct." *Martin v. Duffy*, 977 F.3d 294, 299 (4th Cir. 2020) (cleaned up). Without opining on the first two elements, Monzón fails to put forth evidence demonstrating a causal connection between his protected First Amendment activity of filing grievances and Dr. Haynes filing disciplinary charges against him.

Generally, the "causation element in retaliation claims asks whether the considerations which animated the defendant's conduct were permissible or impermissible." *Martin*, 977 F.3d at 300. The Fourth Circuit instructs district courts to apply the "same-decision" test and its

burden-shifting framework to determine the permissibility of a defendant's disciplinary action. *Id.* at 299 (citing *Mt. Healthy City Sch. D. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). *Martin* discussed variations of that test based on the underlying dispute, and ultimately prescribed a slightly different second step in "unitary event" cases, or cases where "it's undisputed that [the prisoner]'s grievance gave rise to his [discipline]." *Id.* at 302. In those scenarios, the "same-decision test is a clumsier endeavor" because "the permissible and impermissible reasons for taking an adverse action are inseparably intertwined." *Id.* This case seems to fit that bill, as Monzón's grievances (and his language therein) indisputably led to his discipline.

On the first step, when viewed in the light most favorable to Monzón, he establishes a genuine dispute of fact about whether his filing of grievances motivated Dr. Haynes to file disciplinary charges against him. *See, e.g.*, *Moton v. Cowart*, 631 F.3d 1337, 1342 (11th Cir. 2011) (determining that a prison guard's motivation in filing disciplinary charges based on arguably disrespectful content within a grievance was a fact question). The burden therefore shifts to Dr. Haynes to show that she did not file the disciplinary charges to retaliate for Monzón's

Under the unitary event version of the same-decision test, a plaintiff must first establish that "his protected conduct was a substantial or motivating factor in the defendant's decision to take adverse action." *Id.* at 301. If he does, the burden shifts to the defendant to show that she "would have reached the same decision absent a retaliatory motive." *Id.* 303–04. As applied here, Dr. Haynes must show that her motivation behind filing the disciplinary charges against Monzón was not due to his mere filing of grievances (the protected conduct), but due to another permissible reason. If she does, summary judgment is appropriate. *Accord id.* at 304–05.

filing of a grievance against her, but for some other permissible reason. And on the record before the court, she has presented sufficient evidence to carry this burden.

Dr. Haynes establishes that she filed both disciplinary charges because Monzón's use of insolent language (his unprotected conduct) violated Offense Code 222. Monzón's April 13 Offender Request was addressed to "Ms. Haynes," and (1) used her first name after she previously instructed him not to do so; and (2) asserted that she was incompetent and did not deserve to be addressed as 'Doctor.' (ECF No. 44-3 at 22.) In response, Dr. Haynes informed Monzón that he was "written a charge *for the contents* of this request form." (*Id.* (emphasis added); *see also* ECF No. 37-2 at 21.) Following a hearing, Monzón was found guilty of violating Offense Code 222 (ECF No. 37-2 at 22–23), and the Warden and Regional Administrator affirmed that decision (*Id.* at 30–31). In upholding Monzón's conviction, the Warden confirmed that addressing prison staff by their first names violates a "long-time practice in the DOC." (ECF No. 37-2 at 31.) He also explicitly instructed Monzón to "address Dr. Haynes as 'Dr. Haynes' in the future[,]" and that Monzón was "not to address other staff by their first name." (*Id.*) The Warden also noted that Monzón made "numerous other insolent remarks in the request form." (*Id.*)

Then, on October 13 of the same year, Monzón filed a Regular Grievance against each Defendant, using their first names. He also asserted in that grievance that Dr. Haynes was "merely trying to cover up the incompetence and malice of herself and" the other Defendants. (ECF No. 37-2 at 12.) Dr. Haynes charged Monzón with another violation of Offense Code 222 because he used Defendants' first names "despite being charged in the past for this same conduct," and for using other "insolent language." (ECF No. 37-2 at 25.) This charge was later

dismissed on procedural grounds, but the hearing officer stated in her sworn declaration that the underlying conduct would have been enough, if proven, to establish a violation of Offense Code 222. (Stanley Decl. ¶ 7.)

Dr. Haynes states that when she filed the disciplinary charges, she "did not intend to retaliate against [Monzón] for exercising his First Amendment Rights," and avers that she would not have filed any charges against him if Monzón "had filed the grievance without violating prison rules and merely complain[ed] that he had not received proper care." (Haynes Decl. ¶ 24.) Instead, Dr. Haynes filed the charges because her job duties include writing up prisoners who violate prison rules. (*Id.*; *see also* ECF No. 44-5 ¶ 6.)

In sum, the undisputed evidentiary record shows that Monzón violated prison rules against using disrespectful language to prison employees, and he was subsequently charged for those infractions. Monzón admits to writing the grievance forms, which contained insolent language, as found by the hearing officer, Warden, and Regional Administrator. The fact that the rule-breaking language was on a grievance form does not save a prisoner's retaliation claim.[11] *See Guinn v. Crumpler*, No. 7:18-cv-00274, 2020 WL 1666301, at *8 (W.D. Va. Apr. 3,

---

[11] Like the plaintiff in *Guinn*, Monzón "does not deny that he wrote [the] words, but he denies that his words were insolent." 2020 WL 1666301, at *8. Like the court did in *Guinn*, the court thinks no reasonable jury could find his words were not insolent. *Id.* (noting the prisoner wrote that an official was negligent, ignorant, and had a "childish [feeble] mind and like[d] to play games like a child").

This is not a case like *Moton v. Cowart*, in which the Eleventh Circuit held the court erred in granting summary judgment when there was a material question of fact as to whether the prisoner's use of all-capital letters constituted disrespectful language. 631 F.3d at 1342. The court decided summary judgment was not proper there—where the insolent language charge was based on the prisoner's style instead of substance of his grievance—but in so doing noted that "[w]hile the contents of an inmate's grievance could violate a prison rule prohibiting disrespect toward prison officials, using large and upper case letters in a grievance, by itself, cannot." *Id.* Here, Monzón's grievances used the first names of staff after he was expressly told not to, asserted Dr. Haynes did not deserve the title of Doctor, and that all Defendants were incompetent and/or malicious. Even drawing reasonable inferences in Monzón's favor, there is no real dispute that the totality of his language was patently disrespectful.

2020); *Young v. Ream*, No. 2:19-cv-10729, 2020 WL 7701021, at *8–9 (E.D. Mich. June 30, 2020), *R&R adopted*, 2020 WL 7395992 (Dec. 16, 2020) (finding a prisoner failed to establish a fact question on the causation element of his retaliation claim when he was charged for using insolent language after using a prison official's first name in a grievance); *Johnson v. Goodspeed*, No. 1:21-cv-186, 2022 WL 18587784, at *4–6 (W.D. Mich. Nov. 22, 2022), *R&R adopted*, 2023 WL 1227885 (Jan. 31, 2023) (same).

Monzón raises two pieces of evidence that he claims establish Dr. Haynes' retaliatory motive. First, he notes that he regularly uses the first names of other prison staff in grievances and has never before been charged for use of insolent language. (Am. Compl. ¶ 64; *see* ECF No. 37-2 at 33–41 (collecting some of Monzón's prior grievances in which he used a prison official's first name).) Second, he implies Dr. Haynes's retaliatory motive is shown by the officer at his second disciplinary hearing telling him and another inmate—once the audio recording device was turned off—that "[s]ome people came and talked to me about that charge; they really wanted me to find you guilty of it, but I thought it was stupid." (*Id.* ¶ 41.)

Neither of those items raise an issue of material fact as to Dr. Haynes's motivation. As to the first piece of "evidence," none of the past grievance forms provided by Monzón are particularly relevant here. Those grievances do not include the same level of insolent language as the request form and grievance at issue here, so the fact that he was not disciplined for those forms does not establish Dr. Haynes's retaliatory motive for the incidents at issue in the instant matter.[12] As to the second piece of evidence, the court cannot consider the hearing

---

[12] Indeed, Monzón's insistence that his use of Defendants' first names led to his discipline buries the lede. If that was truly the only suggestion of insolence, Monzón would have had a much better case.

officer's alleged statement as evidence at summary judgment because it is inadmissible hearsay.[13] *Cf. Sakaria v. Trans World Airlines*, 8 F.3d 164, 171 (4th Cir. 1993). Moreover, the same hearing officer later declared that if the charges had been properly brought, there would have been enough to find a violation.  (Stanley Decl. ¶ 7.)

Dr. Haynes has presented evidence to demonstrate that she filed legitimate disciplinary charges against Monzón for violating prison rules and not for his mere act of filing grievances. Because Monzón has not come forward with any evidence to create a genuine dispute of fact on that point, Dr. Haynes is entitled to summary judgment on Monzón's First Amendment claim.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment will be granted.

The clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

**ENTERED** this 22nd day of March, 2024.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE

---

[13] The hearing officer's alleged declaration is a non-party statement Monzón "offer[s] to prove the truth of the matter asserted"—i.e., that someone, Monzón implies Dr. Haynes, had a retaliatory motive in filing the charge. Fed. R. Evid. 801(c)(2). Further, none of the exceptions in Federal Rule of Evidence 803 save the otherwise inadmissible hearsay.